ll. Next case of the morning is number 18-60454, Caston v. Bolivar County. Mr. Wade. Thank you, Ms. Caston and the individual defendants. It is over their contention that because both the individual defendants, that is the Chief Deputy and the Head of Investigations and the Sheriff, denied that they influenced the Sheriff to fire Ms. Caston, they say that's just the end of the matter. They denied it, so end of story. A summary judgment is appropriate. So, what I'd like to point out to the court is that fundamentally a jury is entitled to draw inferences from the evidence. And the evidence in this case is that the two families, without trying to get into all the details, was fighting like the Hatfields and McCoys ever since Ms. Caston said, we're not going to have an abortion and that baby is going to be born and live. Just to give the court a few examples, they fought over the child support. They claimed that Chief Deputy falsified his records to keep from paying child support or to reduce the amount of his child support. Over the insurance, he wouldn't give him the insurance card. Probably, if you underlooked Ms. Caston's daughter's testimony on 5-76 and 5-77, she says the fight over the birth certificate, he didn't want his name on the birth certificate. I can see why it was an embarrassment. Thank you, Your Honor. And this went on in Texas. She said she moved to Texas for the year 2015 to get away from the drama. The family, the junior's family had called her a place of employment and she left her job in Mississippi and went to Texas, she said, to get away from it all. And then the dispute continued in Texas over the birth certificate. He wasn't going to put his name on the birth certificate. And that's all discussed on 5-76 and 5-77. And then one of the worst things, she testified that he told her that he was going to tell her son and his son that the reason he wouldn't put his name on the birth certificate was her mama was a, quote, hoe. So there was extreme animosity. And the sheriff says, I don't have a reason why I fired her. She's been there for nearly two decades, but there's no reason. I just And I'd like to refer the court to a case that I negligently failed to cite in my brief, which is really closely on point. It's the Ellerbrook case. Ellerbrook v. City of Lubbock, Texas, 465, Fed Appendix at 330. And this was a retaliation case. It was a retaliation case where this plaintiff said, I didn't get hired because I was assisting an existing employee in making a charge or a protected activity. Decisionmaker adamantly denied, according to this court, that he even knew that the plaintiff had assisted. And this court said in that case that the jury does not have to believe the testimony of an interested witness. We can find that she did know from the circumstances. Well, Your Honor, that's what we have here. They don't offer any other reason. And the persons that have animosity toward the plaintiff, and it's all detailed in the brief. Some of it's not even covered, but extreme animosity continuing. In fact, according to Wesley Jr.'s wife, it's still existing at the time her deposition was taken. It never stopped. Probably was. Yes, ma'am. Well, let me ask you a question, though, because antecedent to the issue of causation is whether this is a First Amendment violation. Your Honor, it's our first claim against the individuals, of course, that's based purely on state law and malicious interference. So as to the county, though, the issue is about the First Amendment violation. And the issue there, the only issue the court addressed and the issue they primarily addressed is they say that her urging her daughter, successfully urging her daughter not to have an abortion is protected speech. They say it's not. That's just a private concern. Well, let me put this in context. Here's what we're talking about, Your Honor. The chief deputy of the county, this is the chief law enforcement officer of the county, and he is urging a low-level employee in a county where there's a very high unemployment rate, where one of the few jobs you can get is working for the county or the state that has prisoners down there. She's urging or telling him, my daughter is not going to have an abortion. That, if it weren't for Roe v. Wade, that'd be a crime, as I pointed out in my brief, would be a felony. So what we have is a speech that she's making and Ted and the chief deputy do not engage in this felony. So we believe that is a matter of public importance. It's not just a private dispute. It's a matter of public importance when she says, I want my daughter to have this baby, and what's more, she's going to have it. Do you have any cases very similar to this? No, I don't, Your Honor. Well, what was her reason? I mean, I can see if she said, you know, I believe abortion is murder, I'm pro-life. That has the flavor of a comment on a public matter. What was, I didn't see that in her comment. I mean, what exactly was her reason? Your Honor, I think that would go, it is true that she didn't, she said she was more concerned about the health, I believe she said the health of the baby. So I don't know what she meant, whether she's thinking or for whatever reason, she was saying that my child is not going to have an abortion, and of course, she's, you know, had she been a lawyer, she'd have probably put it in more, in better terms. That's a very creative argument. One of the problems I have is a case of Connick, which Connick came back right after Pickering, and it made it quite clear that if, unless it's a matter of public concern, there is no balancing, and that's the end of the matter. And it zeroes in on this question of whether these comments, this speech was a public matter, and that's where I'm having some real problems with. Yes, well, Your Honor, Connick and Myers and Pickering and all that, the difference between that and this case is they're always talking about speech that has something to do with employment. You know, it's somehow related to employment to some degree or another. In this case, she's, her speech about my child is not going to have an abortion has nothing whatsoever to do with her job, and Junior's not even her supervisor. The question is, is her right of to be of employment, what is the legal duty? She was fired. What legal duty did that violate? Was she terminally at will? Yes, it violates her rights to freedom of speech. I understand. Now, if we get the constitutional argument, that circles back to the question of whether or not this matter of speech was a, you say it didn't relate to employment, but you said that's why she was fired. I'm sorry, I'm hard of hearing, and I didn't understand, Your Honor's question. Well, we're both in trouble then, because I don't hear so well myself. But what I'm trying to focus on is really trying to get some handle on this First Amendment claim, which is a bit unusual. That is, it sounds to me like this is just on its face, simply private discussions going back and forth, whatever, and not expressing a viewpoint that has anything to do with the large public issues or public matters. Well, Your Honor, I suppose I would, I guess I would look at the viewpoint of having an abortion. Viewpoint, I'm sorry, viewpoint is no qualification of the Pickering-Connick balance. It won't get you there. It's a creative argument, but can you cite me any case that says that? Well, the cases don't, no case arises in this exact factual situation. I'm sure I can't cite any cases that, but I can, you know, I cited in my brief their cases against viewpoint. If she had said, if she'd done this, Your Honor, if she said, fine, my daughter's going to have an abortion. In fact, I'll take her to the clinic. Then we wouldn't be here. She would have had her job to date. The jury could infer that she would. So that was her viewpoint that we're not going to have an abortion. And the fact that she didn't articulately express all the public policy considerations that go into that should not be fatal. It should be enough that she expressed that viewpoint. And I just, Your Honor, I hope I'm not repeating myself, but I feel like all these Pickering and Connick and all that is dealing with speech that is somehow employment-related, in which you have some employer interest. Well, that's not it. This has nothing to do with her. Well, there's a case that might help you out that precisely applies Connick Pickering, and that's a case called Rankin v. McPherson. Do you remember that? I remember the name. Lady in the sheriff's office, I think it was in Harris County, speaking about the attempt on President Reagan's life, said next time I hope they get him. And it went up to the Supreme Court after contentious history in this court, and they said that was protected speech. I do remember that case, and I so appreciate, Your Honor. It didn't occur to me the relevance of that, but that would be a relevant case. I think it would be somewhat relevant. They said that was protected speech. It was a matter of public concern. I wrote Rankin on our court. You wrote Rankin, Your Honor? So I do have some cited speech about the Supreme Court's opinion. But what that was, was that the — it was a comment on the president's policies. The lady was upset with the president, her perception that the president's policies were impairing blacks and minorities. And she — that was her comment. And she made this comment, next time I hope they — you remember what had happened, that President Reagan had attempted assassination and nearly successful. And she had commented about that in the workplace, about that matter, and that's what came down. Well, to me, a comment that if they go for him again, I don't know that she made any — Your Honor was talking about expressing the public policy, just said if they go for him again, I hope they get him. Well, my point being that that is a comment about a public — a matter of public interest. If they're the president, the president's been assassinated, his policies with regard to blacks, et cetera. That was the context, whether right or wrong, and I'm not arguing the case. That was the basis on which Rankin v. Pearson was decided in itself. And I don't see a public — I go back to my question. You are talking about employment because you're complaining about a discharge, aren't you? Well, that's the end result, that she was discharged, but the speech didn't have anything to do with the discharge, just like in Rankin. Of course, there's no explanation, as Judge Costa was making the point, that she didn't really go into all the public policy. If I were to call Rankin, all the policy — Congressman Rankin fired Judge Pearson, and he called a public — he called a press conference, because the president's people were in town, and fired her for this. Well, Your Honor, I'm not familiar with facts, but Your Honor wrote the opinion, so I can't — Well, let me just say what concerns me about this is that she made that comment around — was it 2015 or 2013? And she wasn't fired until three years later. Now, you're saying that the animosity continued and may have built up or whatever, but it wasn't the comment. It was the conduct. It was the course of conduct, don't you think, that led to the firing? Well, Your Honor, I guess one thing. I'd refer the Court to the Salinas case on the Butt Part. Judge Higginbotham was on it. That was interesting. Yes. But also the timing. I mean, it's so much like the Mooney case from this case discussed in the briefs. The first opportune time — a jury could reasonably find the first opportune time the sheriff had to fire was right after he was elected the second time. Well, let me ask you a more fundamental question about causation. What evidence is there that the sheriff knew about the abortion comment? I know there's some evidence he knew about the pregnancy, but what is there that he knew about the abortion comment? There is none unless he could infer from the relationship between the parties and the about applying state standards of causation. We think a federal standard applies. Under the Staub case, if the chief deputy or the deputy knew, that would be enough. They knew — they were motivated by unlawful considerations of her opposing an abortion and got the sheriff to do it. We believe that would be sufficient. That's almost a cat's paw, but what evidence is there that those folks went to — I guess that gets to the torturous interference claim as well. In the sense that they denied it, there's not any, but in the issue is whether the jury has to believe him. And even assuming that the jury has to believe him that he didn't know, then you still got the Staub case because the junior knew and the senior knew. Everybody knows everybody, right? Second right, Your Honor. It's a county of 30,000 people. Everybody knows everybody. And, Your Honor, logically, if the sheriff says, if they find out my chief deputy's impregnated this low-level employee, this is going to cost me the election, what's it going to do to him if the public finds out not only did the chief deputy impregnate her, but he then fired her? So logically, the time for him to fire is right after he gets elected, the second time. That's when the voters would have the least memory of it. That would be the logical time. Just like in Mooney, three years later, the first opportune time came up when they had some layoffs. So it's — so we don't think the timing issue is fatal to it under these circumstances. What's the status of the malicious interference claim? Well, the status of it is the court granted summary judgment saying that all you got is proof that there was animosity between them. No proof, okay. But the problem is, under the Ellerbrook case and some other cases cited in my brief, the jury does not have to believe them when they say we didn't — the sheriff didn't know anything about it. It just doesn't make any sense. I think this is — if I had another case like this, I've had a lot, but I can't remember it, where the sheriff said, well, I just fired her because she's at will. I don't even have a reason. So I just — to me, the jury's entitled to infer you do have a reason, and your reason is because of the — it's either because you didn't like the fact that this baby brought into the world it's causing such issues or because the chief deputy and the chief investigator are pressuring. Those are inferences for the jury. You have a chance for rebuttal, and we'll go to Mr. Griffith. Thank you, Your Honor. Thank you. To please the court, I'm Danny Griffith. I am from Bolivar County, Mississippi, right in the middle of all this. We are a small county. We're a poor area, but we've got a rich culture. At home, being a Delta boy, I'm also the city attorney for Cleveland and the city attorney for Arruval. Five miles up the road is Drew, Mississippi, which, until Anthony Gibson came along, it was famous for being the home of Archie Manning. But if you go to Gibson Part 3 — content, form, context — this is not a First Amendment matter. It's just not. The content, she goes and she's talking to the father, the illicit lover of her daughter, about a pregnancy. And I tell you, I've had a 19-year-old daughter come to me pregnant out of wedlock. There's nothing more personal and private. What about the form? She could have gone to the sheriff. She did. I mean, that conversation took place in a public parking lot, right? Well, it took place — she went to him at work. She went to — I know, but it was in a parking lot. Correct. Well, so it's out in the open. Well, it's kind of private in the parking lot. I mean, it's just not yelling and screaming. In fact, she testified that it was a kind of a normal conversation without raised voices. And what happens there, Judge Jones, is that she goes to somebody who's not her supervisor. She goes to somebody who's in a different wing of the building to big facility corrections and law enforcement. He doesn't have any say over her employment. He is the man who her daughter has the relationship with, and he's trying to talk her into an abortion. At least that's the story. And she said, quit pressuring her. That's purely personal. Now, the form, again, you know, I looked — first in terms of content, being a Delta boy, I call it the LSU case, and I'm not great with case names, but Buchanan Alexander, one just really recent. I mean, there is nothing more protected than what a professor says to a class at a college, right? Oh, my goodness. I got a younger daughter that's an art student. She'd argue that with you all day long. But what's that case? The content there is the personal sexual experiences of the professor. It didn't have an academic purpose. That's dead on point with this content form context analysis here. But when we get to the form here, I looked at the Johnson versus Halstead case, actually. Where did Johnson go? Where did they go? They went up the chain. They went to, I believe, the suggestion in the opinion, and I got it down because I know one of y'all wrote it. But the suggestion in the opinion is look to the listener. Well, the form here, the listener, is not the sheriff. There were communications with the sheriff. Not about abortion. I mean, he's friends of both. Even the daughter, Keisha, in her deposition is talking about, yeah, I talked to the sheriff three times. Talked to him about all these texts I was sending to the wife and this and that and the other. The sheriff just never thought it was that big a deal. He thought he heard heated voices. He said, hey, that doesn't go on here. He wants the facility calm. This is personal. He still knows about it. And, you know, when push comes to shove, the ordinary response of the person in charge is to get rid of the troublemaker. He did. In fact, he's friends with the family. Well, he fired Ms. Kasten. That's my point. Well, not until years later, your honor. And in that situation, that's his facility. And he's not required. Counsel's Reeves case, which is wonderful, it went to the U.S. Supreme Court and all that other stuff. He got the politician to give a reason. In Mississippi, the politician still in an at will employment can say at will employment. So in Reeves, the speculative proof is about your reason with that. This politician had some good legal advice. But, you know, when the animosity is going on and you say it's a big facility, but it can't be that big in a town of in a county of 30,000 people. It's actually huge. It's a state facility. It began under a project where we did a geo bond issue and the revenue from state inmates in there put us a 300 bed facility in. It's pretty big. ACA standards. Great. She's sitting at the front desk, right? She's a receptionist. Yes, your honor. Right when you walk in the correctional side. And then so she's going to see him pretty frequently, the sheriff. And then you have the two investigators, the father and the son, and they're fairly important positions. So it's just seems natural to me that this is something that ends up on the desk of the sheriff. The sheriff actually has a separate warden that runs the correctional facility to meet these ACA standards, which are a monster. And he's in the law enforcement side. He doesn't see her every day. And yet they're friends. And everybody appeared to keep the private matters down from interrupting the facility. That was his testimony. It didn't cause disruption. The sheriff knew the baby visited at one point and said it didn't bother him, which in our new jail, I wouldn't either. In our old jail, which was above the courthouse, I would have panicked if a child went up there. I'm just talking about the interpersonal relations about it. I understand. But and but everything here is that's the way the Delta is, you know. And in fact, actually, the sheriff won so overwhelmingly in 2016 with Anthony Gibson actually coming over to Bolivar County and running against him. We didn't have a lawsuit out of it, but it's everybody knows everybody. But that doesn't make for anything beyond a I'm going to get you. And there's no evidence of that here. You get down to actually the final point on the three points out of Connick, which definitely apply. This Espinoza decision, I thought was interesting because when you're talking about the the context in this situation in Espinoza, there's no widespread public debate about this. This is very private. This is very quiet. It is a personal matter. And if you look at the continuing saga between the two families, Wesley Junior, he's on the birth certificate. He was never proven to have not paid child support. He gets accused of a lot of things, but he refused to sign over having to be the point of contact. She has to suffer through being divorced in this case, and I kind of she's tough. She's our she is the a very significant member of the Cleveland Police Department. She's the first female investigator. And, you know, were it not for her character in dealing with this, maybe it would have all fallen apart. But she she did good things here. That's really what I have. And I'm kind of close to my 10 minutes. I'd love to answer anything or try to that you have. What I see the case is is one more public concern. Judge Brown got it right. She did the right analysis. She cites Gibson three, and she she follows. Essentially, if you look at the fact out in there, it's a, you know, it's a content form context analysis, which is that's what favors us. And that's why the summary judgment ruling Bolivar County should be affirmed here. Thank you. Good morning, Your Honors. My name is Caitlin Riley, and I'm here today on behalf of the Westleys, Gerald Wesley, Sr. and Gerald Wesley, Jr. And I just want to start by saying this case is clearly a case about alleged animosity, but that's it, just alleged. Because in this case, it's been made very clear that the animosity to connect it to the actual termination is quite a stretch. Just looking at the appellant's brief in and of itself, the examples of animosity, like they're all examples that existed between the wife of Gerald Wesley, Jr. and the daughter of the appellant. And there are at least four or five different incidents where they had a disagreement related to the birth of the child, related to their beliefs about the birth certificate and how it should be assigned. But none of those disagreements occurred between the Westleys and the appellant. They were all completely unrelated parties to the extent of this lawsuit. So to say the disagreement between those people, you know, infers over into another that causes them to influence the sheriff is a bit of a stretch. I thought Ms. Kassan had had some unpleasant encounters with Wesley, Sr. There is one allegation that she was approached by Wesley, Sr. and told that the sheriff thought that the continuation of the pregnancy would hurt his campaign for re-election. Now, whether that statement is true, it's been denied by the sheriff. It doesn't matter whether it's denied. The question is whether there's a basis for some re-judgment. Well, Your Honor, that statement, as it is alleged, happened prior to his first election. So then he was elected and he was in office for three more years, four more years. And then he is, the sheriff is then re-elected. And it was after that second re-election that she was actually terminated. So that, it actually never affected it. It didn't become an issue. And after, even though he was elected, he still kept her on for his first term. When was the baby born? Baby was born in December of 2012. And that was after the election, right? Yes, Your Honor. And then they continued to have the fights about the insurance and the birth certificate and other aspects about the existence of the child, right? Your Honor, the actual time frame for those fights is not very clear based on the deposition testimony. Well, it's obviously, they're all obviously after the baby's born. Yes, Your Honor. So some, how far it went into that term, the sheriff's first term, it is unclear. But those fights, that birth certificate issue, the plaintiff states in their brief itself saying that that fight was between the wife and the baby's mother, Ms. Kasten's daughter. Those fights weren't being engaged between the Wesleys and the sheriff and Ms. Kasten. They were between the actual mother and the daughter. And so to say that because those fights were going on, it caused them to influence the sheriff is a bit of a stretch because there's been a denial of animosity between them. And the reason it's important is because the court ruled that they didn't prove, they didn't provide any evidence to support this alleged animosity. And that's important. So what if there was animosity? I mean. That's still not enough, Your Honor. They still have to create that but for. You can fire somebody because you don't like them. If it's in that will state. Yes, Your Honor. And that's kind of the situation here is the judge, is the sheriff. Motivation. Yeah, but the claim here is that the Wesleys influenced the termination. And yes, the sheriff had the right to fire her. But you do have interference with contract, it seems to me. Well, Your Honor. Or business relations tortious interference. But the sheriff, the sheriff, every at the beginning of his term, he would have everyone resubmit their application. Well, look, I can't tell you how many cases we have where people get First Amendment protection when they're being fired by a sheriff because every sheriff in Texas says, well, they're all at will except when they've campaigned for the other guy. Or they, you know, they may be retained unless they've campaigned. But all I'm saying is that in the small circumstances here, it is not it certainly raises a question in my mind that you have the father, the son who have a very long connection with this law enforcement going to the sheriff and saying, get this woman off my back. We don't want to see her every day. Yes, Your Honor. But in this case, they provided no evidence other than we've just got to hope that that was one of the reasons why the sheriff might have made the decision to terminate her. In fact, Miss Kasten testified herself 20 years, right, since 1999. But that was under different sheriffs. And when a sheriff comes in, they have the opportunity to reevaluate. Do they fire? Do they routinely fire people every three years? No, no, Your Honor. But when he first took office, he he evaluated he got his his feet wet. He decided how he wanted to run the sheriff's office under his under his tenure. And so that second go around when he was reelected, it was time for him to start implementing the changes that he had made over the last few years. Well, the question is not really what the sheriff what provoked the sheriff. It's an interference with business relations. It's I mean, wasn't his. It's what these other gentlemen did in regard to the sheriff. Yes, Your Honor. And what did those gentlemen do? There's no evidence of them ever having any conversations with the sheriff about this. The appellant admits that herself. She provided testimony to that fact in the record as on page 225. Furthermore, the sheriff denies ever discussing anything with the Westleys regarding the pregnancy in and of itself, even back in the initial stages of this. Well, frankly, for the sheriff to say I had no reason to fire her except I fired her. Is verges on incredible to me. Well, Your Honor, we're opening the door to all these endless possibilities. He hasn't given a reason. But we're because we're there's been this issues with family members of the Westleys that all of a sudden we have to infer the only other reason that she would have been terminated was because of the Westleys influence. Did he give reasons for what he fired three people on his after his reelection? He fired three people after reevaluating the applications. Did he give reasons for any of the termination? Not that I'm aware of. And this is the type. What about when he how many did he fire when he first got elected? I'm not aware of him making any terminations, but I'm not completely sure on that. But it's my impression and understanding that he he came in, he took the people that were on staff and he reevaluated them after he was reelected. And that gives him the ability to take his department in a different direction. Is the baby named Kasson or Wesley? I do believe it's Wesley, but you ought to know they're your client. I am not. I haven't seen the birth certificate, but I'm not. So I'm not completely sure on that. But I know that I don't think the birth certificate was ever changed. And he has been taking care of this child. He's never denied this child at any time. This it hasn't been this. We don't want it to be involved. It was more of the wife who is the one who's been hit the most by this. And she had a disagreement with, you know, it's hard for me to believe that the guy who's acting like a bigamist is totally blase about the existence of the of the child out of wedlock. In other words, he's totally fine with it, even though he goes home every night and his wife. It's just hard for me to believe that that these gentlemen were papering this over in their behavior. And I don't I don't mean to paint it in that way. Well, that's the way it sounds. I don't believe that it was just everything's OK. But at this point in time, the child is known about Mr. Wesley has taken responsibility for this child. It's not a secret that he has to keep anymore. So it's out there. So he's raising his child. It was a secret, right? I could. I'm sorry, Your Honor. It never was a secret. It doesn't appear like it was a very well-kept secret if it was ever intended to be a secret. But, Your Honor, at the end of the day, there's no reason to believe that the sheriff wouldn't have decided to terminate Miss Cason's employment, but for some influence by the the Wesley's. In fact, the sheriff could have terminated for any reason. So without any evidence giving us something that they actively did, much less something that was intent, intentional or willful or malicious. We just don't have the causation here to continue and put this in front of a jury. OK, thank you very much. Mr. Wade. Your Honor, please. I know it probably sounds like a broken record coming from me, but we're getting to the point where the jury has no, they're just, they're just figureheads, you know, they don't get to decide anything. And the defendants get up there and they say, no, we didn't do it. As was pointed out in the Desert Palace v. Costa case, which talks about we can rely solely on criminal circumstantial evidence. Defendant can deny it till he's blue in the face. I've got, I got a guy named David Portman. You might look at the opinion from Mississippi Supreme Court. He said, I didn't, it was an accident when I killed my wife. And the jury convicted him and Mississippi Supreme Court revealed it. And there's no, no evidence at all except, well, his demeanor wasn't very good when he's talking to the police and there was some minor inconsistencies. And it's up to the jury to decide in a criminal case whether we believe circumstantial evidence. Under the 7th Amendment, it ought to be up to the jury to decide whether they believe these guys and they believe the sheriff when he says, I just fired her with no reason. In response to your Honor's question about other employees were hired, well, in the depositions, I mean, that he fired other employees, we didn't get into why. He wasn't asked why. There's no record about that at all. The only one he's asked about is a plaintiff. And he said, I fired her because she is at will. Now, in a, counsel has described the situation over there, that prison is the major employer. It is a big deal to get fired from the major employer in the county. It'd be a big deal to the jury. And when the employer gets up there and says, I fired her for no reason, after my chief deputy got pregnant, it's going to make the jury mad. It may not make the court mad because we're not in that situation, but it makes, it'd make the jury over in Ballard County upset. She's been there for 19 years and all she's ever done is to say, my child is not going to have an abortion. Now, let me ask about the Wesley's. How do you have a fact issue on malicious interference? Because your Honor, there's, there's, there's circumstance, there's no other reason offered. It's like, you know, it's the classical race test where the employer's reason can be rejected. In this case, the employer gives no reason. And the only incentive, the incentive is the refusal to have the abortion and all the problems that arose after that. That's a logical inference that a jury could draw from the evidence, no direct evidence, but just a logical inference that he must have fired her either because he didn't like the fact that she wouldn't get rid of the pregnancy altogether, which would have eliminated all these problems, or because we have these continuing problems. They all go back to failure to have the abortion. Mr. Riley says that all these quote, now. Your Honor, there's all kind of conflicting testimony. He, the ex-wife got involved in it. She called and tried to get the girl fired, or at least she called the employer. She said she had other reasons for calling. But it, the family's all related to it. Junior's ex-wife is heavily involved in it. There's testimony that the, uh, Ms. Keston's daughter didn't want her around, the ex-wife, because she's afraid she might harm the child. But there's all kind of, you know, evidence in the record about the hostility. But that business about he wanted, he wanted custody of the child, that's all contradicted. The plaintiff said that, oh, disputes were about not wanting to be on the birth certificate and not wanting to pay the insurance. At some point, he claims he wanted to visit with the child, but I believe that's his testimony alone. But, but all that is for the jury. You know, none of us study in law school, Your Honor, about, you know, we don't study about in these type of family squabbles, would that have caused the sheriff of a small Delta County, a very poor Delta County, where everybody knows everybody, to fire somebody? That's not a law school subject, it's a fact question for the jury. Okay, thank you. Court will stand and recess for 10 minutes.